RONALD SCHEFF *et al.*, Plaintiffs, *v.* THE HOMESTRETCH, INC., *et al.*, Defendants.—(RONALD SCHEFF, Plaintiff-Appellant; Quad City Raceway, Inc., Defendant-Appellee.)

Third District   No. 78-38

Opinion filed May 31, 1978.

Robert J. Noe, of Bozeman, Neighbour, Patton & Noe, of Moline, for appellant.

Peter H. Lousberg and Raymond J. Conklin, both of Klockau, McCarthy, Lousberg, Ellison & Rinden, of Rock Island, for appellee.

Mr. JUSTICE ALLOY delivered the opinion of the court:

Plaintiff Ronald Scheff appeals from the dismissal by the Circuit Court of Rock Island County of his Dramshop action. The trial court granted the motion of defendant Quad-City Raceway, Inc. (Quad-City), to dismiss the suit, which decision was based upon a document described as a release executed in defendant's favor by plaintiff. On appeal plaintiff contends (1) that any such exculpatory release of liability under the Dramshop Act would be contrary to public policy and that (2) the release does not cover Quad-City's liability under the Liquor Control Act, more commonly referred to as the Dramshop Act (Ill. Rev. Stat. 1977, ch. 43, par. 135). Plaintiff Cathy Scheff brought an action for loss of means of support but that portion of the case is not involved in the current appeal.

On August 28, 1976, defendant Quad-City Raceway, Inc., operated a stock car racetrack in Rock Island County and sold alcoholic liquors at the track. Plaintiff Ronald Scheff was a participant in the stock car races on August 28, 1976. Prior to his participation in the racing events, Scheff had executed a document entitled "Voluntary Release—Assumption of Risk and Indemnity Agreement." Execution of that document was a required condition before Quad-City Raceway would allow persons to enter the restricted pit area or to participate in the races themselves. The document, in pertinent part, provided that Scheff agreed to:

"Release, discharge and covenant not to sue the track operators, track owners, land owners, racing association, and each of them, their officers, agents and employees (hereinafter collectively referred to as 'releasees') from any and all claims and liability arising out of strict liability or ordinary negligence of releasees or any other participant which causes the undersigned injury, death, damages, or property damages."

Persons executing the document were granted permission to enter the restricted pit area, to participate in racing events, and they were covered under a master hospitalization insurance policy.

The allegations in the complaint, which we are considering as true for the purposes of this analysis, state that on August 28, 1976, one Brad Kelly was sold or given alcoholic beverages at the racetrack and that he became intoxicated. Kelly then drove a race car into another vehicle which was being driven by plaintiff Ronald Scheff. As a result of the collision, Scheff suffered severe and permanent injuries. The action was thereafter brought against Quad-City Raceway under the Dramshop Act, through which Ronald Scheff sought recovery for his injuries.

Quad-City Raceway filed a motion to dismiss Ronald Scheff's dramshop action on the basis that the release executed by Scheff acted as a bar to any such suit. The trial court agreed and dismissed the dramshop action filed by Scheff.

As we have noted, there were two issues raised on appeal; first, that if the release does cover dramshop liability, it is void against public policy, and, secondly, that the language of the release must be strictly construed, and strict construction of the release requires a finding that it does not cover dramshop liability. From our analysis of the cases and the record in this cause, we conclude that the exculpatory clause, to the extent that it releases against dramshop liability, is contrary to established public policy of the Dramshop Act. For the purposes of our discussion, we assume that the trial court was correct in finding that the exculpatory clause was intended to cover liability under the Dramshop Act, but in view of our determination of the basic issue relating to public policy, we do not deem it necessary to discuss the other issue raised on appeal in this cause.

■■ ■ Normally, contractual exculpatory clauses are upheld unless enforcement of the clauses would be against public policy or unless the social relationship of the parties militates against enforcement. (*Jackson v. First National Bank* (1953), 415 Ill. 453, 114 N.E.2d 721; *Gowdy v. Richter* (1st Dist. 1974), 20 Ill. App. 3d 514, 525, 314 N.E.2d 549.) Thus, in *Morrow v. Auto Championship Racing Association, Inc.* (1st Dist. 1972), 8 Ill. App. 3d 682, 291 N.E.2d 30, the appellate court of this State upheld an exculpatory agreement between a race driver and a promoter of a stock

car race which released the latter from claims due to the latter's negligence. It found that there was nothing about the relationship of the parties which would except the agreement from the general Illinois rule with respect to exculpatory clauses. The court found nothing contrary to public policy implicated in the enforcement of that exculpatory clause (8 Ill. App. 3d 682, 686). In the instant case, however, enforcement of the exculpatory clause at issue is against the articulated public policy of the State of Illinois as found in the Liquor Control Act and cases decided thereunder.

Section 1 of the Liquor Control Act (ch. 43, par. 94) states:

> "This Act shall be liberally construed, to the end that the health, safety and welfare of the People of the State of Illinois shall be protected and temperance in the consumption of alcoholic liquors shall be fostered and promoted by sound and careful control and regulation of the manufacture, sale and distribution of alcoholic liquors."

The Act, which imposes "no fault" liability, is penal in nature and was designed to act as a constraint upon those dispensing liquor to the public. (*Wessel v. Carmi Elks Home, Inc.* (1973), 54 Ill. 2d 127, 295 N.E.2d 718.) Originally, the constraint referred to was direct in its impact, but with the current general use and availability of dramshop insurance, the constraint is indirect, but still effective. An owner or operator who fails to discourage the intemperate consumption of alcohol now faces the possibility of losing his insurance or of paying prohibitively high premiums as a result. (*Dworak ex rel. Allstate Insurance Co. v. Tempel* (1959), 17 Ill. 2d 181, 191, 161 N.E.2d 258.) The Illinois Supreme Court in *Wessel* (a case in which the court held the dramshop owner or operator had no right of indemnity against an intoxicated tortfeasor), restated these policies and considerations underlying the Dramshop Act (at 54 Ill. 2d 127, 131):

> "Policy considerations, as defendants concede, are of substantial importance in this matter. As repeatedly stated by this court, the statute, as applied to a dramshop owner or operator, is penal in character. [Citations.] This penal nature is further emphasized by the liability limitations contained therein.
>
> Moreover, the Liquor Control Act specifically states that it is designed to protect health, safety and welfare and to foster and promote 'temperance in the consumption of alcoholic liquors * * * by sound and careful control and regulation of the manufacture, sale and distribution of alcoholic liquors.' [Citation.] To this extent the statute provides a basis for the discipline of dramshop operators and owners for their indiscriminate sale of liquor and the evils resulting therefrom. (See *Dworak ex rel. Allstate Insurance Co. v. Tempel* (1959), 17 Ill. 2d 181.) As

realistically viewed in *Dworak* this discipline may be of an indirect nature which arises from the owner's or operator's fear of cancellation of insurance or prohibitive premiums.

These factors demonstrate that a substantial burden has been placed upon those engaged in the liquor industry. Such responsibility, although possibly more stringent than that imposed upon other business ventures, is permissible as a proper exercise of the State's regulatory control of intoxicating liquors. [Citations.] * * *"

In *Wessel*, as we have noted, the court refused to extend the right of indemnity by the tavern operator toward the intoxicated tortfeasor and found that such extension would frustrate the public policy behind the Act and diminish its disciplinary feature. As stated by the court (at 54 Ill. 2d 127, 132):

"Absent a clear legislative mandate to the contrary, the cost accruing for a violation of the [dramshop] statute should be borne by those profiting from the sale of liquor to the public who enter such commercial enterprises with full knowledge of this attendant liability."

In the instant case, the disciplinary and deterrent effects of liability imposed by the Act would be substantially diminished if dramshop owners and operators were able to contract away that liability by the device of an agreement such as we have in the instant case. Exulpatory contracts, by reducing the deterrent effects on owners and operators, would thereby frustrate the purpose and policy behind the Act which seeks to prevent the indiscriminate sale of liquor and the evils resulting therefrom and to place the burden for violations on those profiting from the sale of alcohol. If the raceway, and other similar establishments, can exculpate themselves from possible dramshop liability through the use of releases, then there is much less incentive for the operators to carefully regulate and control their sales of alcohol. In addition, they would be allowed to avoid the legislatively mandated "penal" sanctions for violations of the Act. While apparently, in the present case, releases were only obtained from participants and those choosing to be in the pit area, nevertheless, if the raceway is allowed to exculpate itself against dramshop liability to those persons, there is little to prevent their obtaining similar releases as a condition of entry into other areas and even as to spectators in the areas.

■■ Contrary to the Raceway's arguments, the agreement involved in this cause does not address itself solely to possible liability on its part which may arise from the hazardous activity of stock car racing. Such an agreement, designed to protect track operators from liability arising out of the hazards and dangers inherent in stock car racing, would appear to

be valid, absent unconscionable nullifying elements. Releases obtained from performers voluntarily engaged in highly dangerous activities, stand on a different ground than the release obtained in the present case, where the liability sought to be protected against was not one arising out of the nature of activity of the participants who were performing. Rather, the liability sought to be protected against arises from the manner in which the owner or operator regulates and controls the sale and distribution of alcohol to persons at the racetrack. The situations are entirely distinct, and in the instant case the policy and purposes behind the Dramshop Act are substantially involved. Those policies and purposes, as has been noted, militate against any release of liability under the Dramshop Act. Accordingly, we find that the exculpatory clause in the document signed, insofar as it seeks to protect Quad-City from possible dramshop liability, is unenforceable as against the public policy of this State, as enunciated in the Liquor Control Act, also known as the Dramshop Act.

For the reasons stated, therefore, the judgment of the circuit court in dismissing plaintiff Ronald Scheff's suit is reversed and this cause is remanded for further proceedings in this cause.

Reversed and remanded.

BARRY, P. J., and STOUDER, J., concur.